Filed 3/10/23  P. v. Chavez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUAN DANIEL CHAVEZ,<br><br>    Defendant and Appellant. | D080465<br><br><br>(Super. Ct. Nos. SCS167911 & SCS149245) |


APPEAL from an order of the Superior Court of San Diego County, Kimberlee A. Lagotta, Judge.  Affirmed.

Laura Arnold under appointment by the Court of Appeal for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Kathryn A. Kirschbaum and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

Juan Daniel Chavez, appeals from an order extending his civil commitment as a mentally disordered offender (MDO) under Penal Code[1] sections 2970 and 2972. He contends: (1) his constitutional right to due process was violated because the petition on which he was tried did not allege he had serious difficulty controlling the behavior that rendered him a substantial danger of physical harm to others and the court did not instruct the jury on this requirement, and (2) the jury's finding is not supported by sufficient evidence. Respondent submits that the statutory language adequately conveyed the kind and degree of risk the jury had to find to extend the MDO commitment, and that substantial evidence supports the verdict. We affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

On August 1, 2000, Chavez pled guilty to robbery in violation of section 211. Two years later, he pled guilty to exhibiting a deadly weapon to a police officer to resist arrest in violation of section 417.8. He further admitted to personally using a deadly weapon during the commission of that offense. Chavez was committed to the California Department of Corrections and Rehabilitation but was subsequently determined to be an MDO and involuntarily confined to a state hospital for treatment. The district attorney sought and received multiple one-year extensions of Chavez's commitment.

On December 18, 2020, the district attorney filed a petition pursuant to section 2970 to extend Chavez's commitment by another year—from April 11, 2021, to April 11, 2022. Chavez requested a jury trial on the petition but, due to delays related to the Covid-19 pandemic, the trial did not begin until March 8, 2022.

---

1    All further undesignated statutory references are to the Penal Code.

2

At trial, the district attorney presented testimony from numerous experts addressing the question of whether Chavez had a severe mental disorder that was not in remission and could not be kept in remission without continued treatment, and whether because of his severe mental disorder, Chavez represented a substantial danger of harm to others. In considering whether Chavez had a severe mental disorder that could not be kept in remission without treatment, the jury was instructed to focus on the period between March 8, 2021, and March 8, 2022.

A.   *Chavez's Diagnosis*

Two court-appointed psychologists examined Chavez prior to March 2021 and rendered opinions as to his mental illness. Dr. David Bloch diagnosed Chavez with schizophrenia, while Dr. Randy Stotland diagnosed him with schizoaffective disorder, bipolar type. Dr. John Johnson, a psychologist at Patton State Hospital (Patton), explained that to be diagnosed with schizophrenia, an individual must experience delusions and hallucinations that impact daily functioning over a period of at least six months. He further explained that schizoaffective disorder is essentially schizophrenia with additional "symptoms of bipolar disorder such as mania, rapid speech, pressured speech, tangential thinking, things of that nature." In Chavez's case, Dr. Stotland said he diagnosed Chavez with schizoaffective disorder because his emotions vacillated between mania and depression or anger.

B.   *Treatment at Patton State Hospital*

Chavez was in sheriff's custody prior to the one-year time frame at issue in this case and was returned to Patton on March 11, 2021. Dr. Marc Peterson, a psychiatrist, admitted Chavez to Patton at which time he said Chavez was agitated and became "very focused" on a nurse he thought had

3

done bad things to him in the past. He described Chavez as "very hostile and threatening" and said the nurse had to leave the area because Chavez kept yelling negative things at her. Because of this behavior, Dr. Peterson administered emergency medications to calm Chavez. When he remained agitated after 90 minutes, Dr. Peterson gave him a second dose, which ultimately calmed him enough so that officers could remove his handcuffs.

Dr. Peterson explained that schizophrenia is "a thought disorder where people experience reality different[ly] than the average person." He said that sometimes a schizophrenic person will feel better and stop taking their medication, at which point they could become dangerous *if* the symptoms of their mental illness cause them to be dangerous—he said, "it really comes down to the individual." In the short term, he indicated that studies link things like agitation, yelling, increased emotions, and running around flailing their arms to immediate violence in the next five to ten minutes.

Chavez was soon moved to the acute unit. On March 14, 2021, Chavez became agitated and was yelling at a Patton employee. A psychiatric technician testified that staff members were unable to calm him. He recalled Chavez saying, "what are you going to do? You going to take me down? If you come at me, I'm going to fight you." When Chavez then raised his fists in a "fighting stance," staff members put him in a five-point restraint to protect employees in the hallway and the three other patients who were in the room with him. A staff member then applied a spit mask because Chavez was spitting at a person nearby. Chavez continued to yell and tense up in his restraints, so he was given emergency medication to subdue him.

The next day, Dr. Johnson assessed Chavez and concluded that he was not ready to be removed from restraints because he remained in a state on the border between "psychotic aggression and instrumental aggression." He

4

explained that psychotic aggression usually meant the patient was "responding to voices to hit, to harm, to do something, oftentimes to reduce the voices themselves," while instrumental aggression involved behaving aggressively to get what the person wants. Dr. Johnson noted that Chavez was impulsive, unable to stay focused, did not seem to even know why he was there, and was "not concerned about the harm that may have befallen the staff member." By March 17, 2021, Patton doctors had received court authorization to involuntarily medicate Chavez for a short period of time.

Dr. Dey, a staff psychologist at Patton, described her impressions from brief interactions with Chavez between March and August 2021. She said he greeted her daily when she arrived on the unit and was polite, but she had difficulty ascertaining exactly what he was requesting because "[h]is speech was always very disorganized." She reported that Chavez said he was confused by his own thoughts. He also said he experienced auditory and visual hallucinations, but his disorganized speech prevented Dr. Day from understanding what he saw or heard. However, on one occasion, he expressed a persecutory delusion about being neutered or having his scrotum cut, which concerned her because she said anyone who believes they might be harmed (mentally ill or not) may feel the need to defend themselves.

Dr. Dey noted that Chavez only attended about 23 percent of the treatment groups to which he was assigned. She reported that Chavez contacted various departments within the hospital and left multiple messages a day displaying rapid speech and disorganized thinking, but that he did not have any incidents of aggression once he arrived in her unit. She said his "level of disorganization [was] one of the most severe" she had seen and that it concerned her because "when somebody has that level of disorganization, usually those individuals are not able to accurately perceive their

5

surroundings and think correctly about different situations they're in." She did not believe he had any insight into the fact that he needed medication, as evidenced by the fact that he told her he did not plan to continue taking medication when he no longer had to do so.

A licensed clinical social worker at Patton, Kim Braxton, testified that Chavez came to her office at least every other day to talk. She said "[h]e was always disorganized and always confused." She reported that Chavez told her he heard voices, but that he dealt with voices that made him mad by ignoring them or calling his mom. She also indicated he used coping strategies like talking, writing, walking, or listening to music. Nonetheless, she opined in a report that he was not able to use his positive coping strategies "to prevent himself from physically assaulting other people for at least a twelve-month period."

Ms. Braxton said Chavez voluntarily took his medications, but only intermittently, and she did not think he understood their importance or how they "reduce[d] the frequency of his auditory hallucinations and paranoid ideations." She also noted that he was not yet able to describe how his mental illness led to his crimes. But she testified that his behavior seemed the same whether he was on or off of his medications and she never felt threatened by him. She also indicated that he had a "good rapport" with her and other patients in his group and that no one had reported any conflicts with Chavez or that they felt unsafe around him.

Dr. Basant Singh, a staff psychiatrist at Patton, assessed Chavez's progress on May 7, 2021. At that time, Chavez was not under the involuntary medication order, but was taking his medication, and was calm. Dr. Singh noted that Chavez was dysphoric, which he explained was "a combination of irritability, anxiety, depression, and [a] feeling of uneasiness." He began

6

treating Chavez with a mood stabilizer and, when it appeared effective, changed his diagnosis from schizophrenia to schizoaffective disorder.

In August 2021, Dr. Jenna Tomei, a senior psychologist specialist in forensics at Patton who explained that her role is to "use psychological concepts to answer legal questions," was asked to evaluate whether Chavez met the criteria for his commitment at Patton to be extended. She did not meet with Chavez, but she reviewed his legal documentation, jail records, medical records, and progress notes from Patton. In her report, she concluded that Chavez had schizoaffective disorder, bipolar type; it was not in remission; he did not have a plan for managing his mental illness or other stressors out in the community; and he represented a substantial danger of physical harm to others due to his mental health disorder. She explained that "[j]ust because somebody might have a history of violence or mental illness doesn't necessarily mean they're going to be violent in the future," but "they really need the insight into what happened and a good understanding and a good plan in place in order for the same things not to happen again," and Chavez did not have those things.

C.  *Medical Reports from San Diego County Jail*

Chavez was moved to San Diego County Jail in August 2021 for court appearances and remained there through March 2022. Dr. Anthony Cruz, a jail psychiatrist, explained that they generally cannot force individuals to continue taking the medications prescribed by state hospitals. During the two years he treated Chavez during his stays in jail, he noted that Chavez sometimes refused some or all of his medications, which caused him to suffer mania, psychosis, disorganized thinking, and pressured speech. Dr. Cruz said he had seen Chavez do well with medication and knew he had the capability to be stable but said Chavez lacked insight into his severe mental disorder.

He clarified that Chavez always wanted help and was agreeable to Dr. Cruz's medication recommendations, but implied Chavez was more focused on the side effects of the medications than treatment of his mental illness. In Dr. Cruz's opinion, Chavez did not present a danger to others because he was always polite and other jail staff had not reported that Chavez had ever behaved in a violent or aggressive manner.

Jennifer Alonzo, a licensed clinical social worker at the jail, believed Chavez took his antipsychotic medication from August 2021 to March 2022, though he sometimes refused a certain medication and requested a medication change. She saw him at least every other week and said she never felt in danger around Chavez, nor had she witnessed or heard of him making any threats or being involved in any assaults. Ms. Alonzo noted that when Chavez stopped taking his medications and decompensated during a prior incarceration, he kept busy by writing, talking to her, walking, listening to music, and watching television. But she acknowledged it was "questionable" whether Chavez understood that he would always have a severe mental disorder and would have to take medication for the rest of his life.

D. *Examinations By Court-Appointed Psychologists*

Two court-appointed psychologists were asked to examine Chavez in 2020, and then provide several follow-up reports during the time the case was delayed due to the pandemic.

a. *Dr. Bloch*

Dr. Bloch examined Chavez twice by video while Chavez was confined in jail and diagnosed him as schizophrenic. He reported that on December 1, 2020, Chavez "rant[ed] and rav[ed] like a lunatic" and appeared angry and agitated. He said that Chavez walked back and forth towards the camera, explaining that this type of pacing "is a very common characteristic of people

8

who can be dangerous" because they may confront the other person physically. Dr. Bloch stated that most of what Chavez said was incomprehensible "word salad," which he explained was "[g]arbled speech that was difficult to understand" because "[t]he words and phrases . . . wouldn't logically follow each other."

Dr. Bloch opined that Chavez was in a state of psychosis, which he defined as "a mental state that is characterized by a very significant detachment from perception of reality or characterized by inability for one to control oneself both mentally and physically." He said a person in this state "has ideations that include[] hallucinations perhaps or delusions . . . and has great difficulty or perhaps cannot at all discern between a [delusion] they're having and reality or hallucinations they're having and reality." When asked whether individuals in a state of psychosis are typically violent towards others, Dr. Bloch responded, "Not usually. No." With regard to Chavez specifically, he noted that he did not believe Chavez was taking his medications at the time and concluded that he met the MDO criteria. He further opined that Chavez lacked insight into his mental illness, which prevented him from regulating his behavior and having insight into his need for treatment. As a result, Dr. Bloch said Chavez represented a substantial danger to others because, for example, he could "have [a] hallucination where a voice is telling him . . . go harm that person" or "a [delusion] that somebody's going to attack him and he better attack first."

In his February 10, 2021 report regarding a subsequent video interview while Chavez was at the jail, Dr. Bloch said Chavez again ranted nonstop; was loud, angry, and incomprehensible; and made obscene hand gestures.

During a May 7, 2021 video interview conducted once Chavez returned to Patton and was "pretty calm," Chavez read a prepared statement, "had

9

some sense that this was a situation where he should be cooperative and polite," and appeared to have some insight into his mental illness and need for treatment. However, Chavez's speech then became increasingly rapid and switched to word salad. Dr. Bloch noted that Chavez "expressed some delusional ideations by saying [Dr. Bloch] was coordinat[ing] and directing his body." Dr. Bloch ultimately opined that Chavez continued to meet the MDO criteria.

Dr. Bloch reviewed Chavez's Patton records and prepared a report on September 3, 2021, at which point he noted Chavez had made progress that might warrant a reexamination. Nonetheless, the records did not change his opinion that Chavez continued to meet the MDO criteria. He came to the same conclusion in a February 25, 2022 report after reviewing Chavez's jail records.[2] Dr. Bloch noted that the jail records contained notes from psychiatrists, and he found them "very remarkable" because Chavez "was described as a model patient, he was cooperative, which was not always the case before. He was calm. He was pleasant. Described as polite, respectful. . . . . A very different Mr. Chavez that (sic) I experienced." He viewed this difference as something "of great concern" that "in and of itself warrant[ed], in [his] opinion, a more thorough psychiatric examination." Although another evaluation did not occur, Dr. Bloch opined that because Chavez did not fully grasp that he has a severe mental illness and that he will need treatment for the rest of his life, he is certain Chavez will stop taking his medication if released and "revert to becoming acutely psychotic." He also expressed that, although he never obtained an explanation of the difference in Chavez's behavior, the way he thought about it was that "as soon as a certain

_____

[2] Dr. Bloch subsequently acknowledged that he had not reviewed records from licensed clinical social worker Alonzo.

10

kind of situation . . . presents itself, it exceeds his ability to control himself. And so he explodes into this psychotic, ranting episode, which is not characteristic of the way he is."

Dr. Bloch also pointed out that during his examinations, he is looking at a "sample of behavior" and that, because Chavez wants to get out of the hospital, he would expect him to "act in some way to indicate that he's in control of himself, that he's better, that he's doing well, that he doesn't need— any longer need[] to be at the hospital." Instead, Chavez "rants and he raves and shouts and yells and paces up and down and flails his arms and swears and makes obscene gestures, demands to leave the room and so on." Dr. Bloch said this tells him that when Chavez "is experiencing some kind of stressor, that he is unable to control his conduct or behavior." But Dr. Bloch also acknowledged with regard to Chavez's behavior in the courtroom, "Right now he's great."

When asked "Is it reasonable that a person with schizophrenia who has incoherent speech patterns is also not dangerous?" Dr. Bloch responded, "Absolutely. The vast majority of people who have . . . mental illnesses are not at all dangerous."

b. *Dr. Stotland*

Dr. Stotland first met with Chavez in 2020, at which time Chavez was suffering command hallucinations that told him to pray (he followed the commands and prayed). When Dr. Stotland asked about his mental illness, Chavez told him it was a problem with the environment. He next assessed Chavez by video in February 2021, and in person on March 20, 2021. During the latter meeting, Chavez again reported command hallucinations wherein children called his name and told him not to pray, and "rulers" commanded him to do things. This concerned Dr. Stotland because such command

11

hallucinations can result in dangerous behavior. He stated the Chavez had an IQ of 80 and opined that he had an undiagnosed and untreated learning disability which impaired his ability to learn from therapy groups, fill out relapse prevention plans, and navigate through his illnesses. However, he was unable to complete his examination because Chavez declined to continue.

Dr. Stotland opined at that time that Chavez met the MDO criteria and posed a substantial danger because he had not participated in treatment adequately, had poor judgment and insight, and lacked adequate remorse. He renewed this opinion after his two-and-a-half-minute video conversation with Chavez on May 19, 2021, during which Chavez began as cordial, then said something angry about pandering against the government, then politely said thank you and got up and left.

The court subsequently asked Dr. Stotland to review updated records from Patton and the jail and opine as to whether they changed his view. In reports from September 2021 and February 2022, Dr. Stotland confirmed his opinion that Chavez continued to meet the MDO criteria.

E.    *Jury Verdict and Recommitment Order*

On March 15, 2022, the jury found the allegations of the petition to be true, and the court issued an order extending Chavez's commitment by one additional year. Chavez timely appealed.

## DISCUSSION

### I

*Legal Principles*

"An MDO proceeding is civil, rather than criminal, in nature." (*People v. Fisher* (2009) 172 Cal.App.4th 1006, 1013.) "The Mentally Disordered Offender Act (MDO Act), enacted in 1985, requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment during and after the termination of their parole until their mental disorder can be kept in remission. [Citation.] Although the nature of an offender's past criminal conduct is one of the criteria for treatment as [an MDO], the MDO Act itself is not punitive or penal in nature. [Citation.] Rather, the purpose of the scheme is to provide MDO's with treatment while at the same time protecting the general public from the danger to society posed by an offender with a mental disorder." (*In re Qawi* (2004) 32 Cal.4th 1, 9.)

If the individual's severe mental health disorder is not in remission or cannot be kept in remission without treatment after the initial term, the district attorney may file a petition asking the superior court to continue involuntary treatment for an additional year. (§ 2970, subds. (a) & (b).) Each yearly extension requires the court or jury to find beyond a reasonable doubt that "the patient has a severe mental health disorder, that the patient's severe mental health disorder is not in remission or cannot be kept in remission without treatment, and that by reason of the patient's severe mental health disorder, the patient represents a substantial danger of physical harm to others." (§ 2972, subds. (a)(2) & (c).)

## II

### *The Jury Instructions Were Sufficient*

Chavez argues that Penal Code sections 2970 and 2972, unless construed as requiring "serious difficulty controlling behavior," violate state and federal constitutional due process guarantees. Respondent appears to concede this point, stating "[t]he jury was properly instructed using the appropriate statutory language and that language adequately conveyed to the jurors the requirement of a mental health disorder that causes serious difficulty in controlling violent behavior." The two parties' positions conflict in that, while Respondent contends that the instruction given, CALCRIM 3457, necessarily implied a finding that Chavez had serious difficulty controlling his behavior, Chavez believes that a supplemental instruction was required to satisfy due process.

"A court must instruct on the general principles of law that are relevant to the issues in a given case. Instructions, therefore, must disclose the principles that are closely and openly connected with the facts and are necessary for the jury's understanding and deliberation of the case." (*People v. Beeson* (2002) 99 Cal.App.4th 1393, 1401.) We review claims of instructional error de novo. (*People v. Thomas* (2023) 14 Cal.5th 327, 361.)

Here, Chavez asserts the court was required to instruct the jury sua sponte that it had to find Chavez posed a substantial danger of physical harm because of a severe mental disorder which caused him to have serious difficulty controlling his behavior. Chavez acknowledges that in addressing the same MDO statutory scheme, the court in *People v. Putnam* (2004) 115 Cal.App.4th 575 (*Putnam*) rejected this argument. However, Chavez asserts *Putnam's* holding should be reconsidered in light of subsequent clarification of the law.

14

The United States Supreme Court has long recognized the need for commitment statutes explaining, "The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves; the state also has authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill." (*Addington v. Texas* (1979) 441 U.S. 418, 426.) While the court acknowledged that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection" (*ibid*), it has determined that civil confinement of mentally ill and dangerous offenders does not offend due process if these individuals are *unable* to control their behavior. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 358.) Moreover, the state does not have to prove that the offender has a *total* lack of control; proof of "serious difficulty in controlling behavior" is sufficient. (*Kansas v. Crane* (2002) 534 U.S. 407, 412–413 (*Crane*).)

In *People v. Williams* (2003) 31 Cal.4th 757, 759 (*Williams*)*,* our Supreme Court applied the due process standard established in *Crane* to a civil commitment scheme under California's Sexually Violent Predators Act (SVPA) (Welf. & Inst. Code, § 6600 et seq.). The defendant in *Williams* contended reversal of his commitment was required because the statutory language of the SVPA did not include the federal constitutional requirement of proof of a mental disorder that causes serious difficulty in controlling behavior, and the court did not instruct the jury on the requirement of a volitional impairment. (*Williams, supra*, at p. 764.)

The Supreme Court rejected the defendant's position, explaining that "[b]y its express terms, the SVPA limits persons eligible for commitment to those few who have already been convicted of violent sexual offenses against

15

multiple victims [citation], and who have 'diagnosed mental disorder[s]' [citation] 'affecting the emotional or volitional capacity' [citation] that 'predispose[] [them] to the commission of criminal sexual acts in a degree constituting [them] menace[s] to the health and safety of others' [citation], such that they are 'likely [to] engage in sexually violent criminal behavior' [citation]. This language inherently encompasses and conveys to a fact finder the requirement of a mental disorder that causes serious difficulty in controlling one's criminal sexual behavior." (*Williams, supra,* 31 Cal.4th at p. 759.) The court concluded that because the jury instructions tracked the statutory language, no additional instruction was necessary. (*Id.* at p. 777.)

In *Putnam*, an appellate court acknowledged that *Williams*, *supra*, 31 Cal.4th 757, pertains to a different statutory scheme, but concluded its rationale likewise applied to an MDO proceeding. The *Putnam* court explained that "[i]n the MDO context, just as in the SVPA context, instructing the jury with the applicable statutory language adequately informs the jury of the kind and degree of risk it must find to be present in order to extend an MDO commitment. The instructions here informed the jury that in order to find that appellant had a severe mental disorder, it had to find that he had 'an illness or disease or condition that substantially impair[ed] [his] thoughts, perception of reality, emotional process, or judgment, or which grossly impair[ed] [his] behavior.' Moreover, in order to find that the disorder was not in remission, the jury had to find that 'the overt signs and symptoms of the severe mental disorder' were not under control. Finally, the jury was instructed that it had to find that '*by reason* of such severe mental disorder, [appellant] represents a *substantial* danger [of] physical harm to others.' Italics added.)" (*Putnam*, *supra*, 115 Cal.App.4th at p. 582.)

16

The court concluded, "Given these instructions, taken as a whole, we conclude beyond a reasonable doubt [citation] that the jury could not have sustained the section 2970 petition in this case without having found that, as a result of appellant's mental disorder, he suffered from a seriously and substantially impaired capacity to control his behavior, and that, for this reason, he represented a substantial danger of physical harm to others. In other words, the instructions given here, which tracked the language of the MDO statute, necessarily encompassed a determination that appellant had serious difficulty in controlling his violent criminal behavior, and thus, as in *Williams*, separate instructions on that issue were not constitutionally required. [Citation.]" (*Putnam, supra,* 115 Cal.App.4th at p. 582.)  The court did not reach the issue of whether such an instruction might be appropriately given if requested.  (*Id.* at p. 583.)

Here, as in *Putnam*, *supra*, 115 Cal.App.4th 575, the jury was instructed that to find Chavez an MDO, it must find: "one, he has a severe mental disorder; two, the severe mental disorder is not in remission and cannot be kept in remission without continued treatment; and three, because of his severe mental disorder, he presently represents a substantial danger of physical harm to others."  The court further explained that "[a] severe mental disorder is an illness or disease or condition that substantially impairs the person's thought perception of reality, emotional process or judgment or that grossly impairs his or her behavior or that demonstrates evidence of an acute brain syndrome for which prompt remission in the absence of treatment is unlikely."  Finally, the jury was instructed that "[r]emission means that the external signs and symptoms of the severe mental disorder are controlled by either psychotropic medication or psychosocial support."

17

We agree with the court in *Putnam*, *supra*, 115 Cal.App.4th 575 that these instructions, which comport with MDO law, necessarily required a jury finding that Chavez's mental disorder caused serious difficulty in controlling his violent behavior.[3] Thus, his recommitment as an MDO met due process standards.

Our holding is not inconsistent with *In re Howard N.* (2005) 35 Cal.4th 117 (*Howard N.*) cited by Chavez to support his claim of reversible error. In *Howard N.*, the court addressed Welfare and Institutions Code section 1800 et seq., which allowed continued civil commitment with the Youth Authority of an individual who was "physically dangerous to the public because of his or her mental or physical deficiency, disorder, or abnormality." (*Id.* at p. 126.) Unlike the MDO statutes, the statute at issue did not provide any definition of "mental . . . deficiency, disorder, or abnormality." (*Id.* at p. 136.) Because the statutory language did not expressly require a demonstration that the individual had serious difficulty controlling his dangerous behavior, the court "constru[ed] the existing language to include such a requirement" in order to "preserve the constitutionality of the statutory scheme." (*Id.* at pp. 132, 135.) By contrast, although the MDO statutes also do not contain the exact words "serious difficulty controlling behavior," they do provide definitions of "severe mental disorder" and "remission," which, when coupled with the mandated level of dangerousness, inherently require a finding of a control impairment. We find these definitions sufficient because, as the high court advised in *Crane,* "there may be 'considerable overlap between a . . . defective understanding or appreciation and . . . [an] ability to control . . . behavior.' "

---

3    Because Chavez's trial counsel did not request a separate control impairment instruction, we also decline to reach the issue of whether such an instruction might appropriately be given if requested.

(*Crane, supra,* 534 U.S. at p. 415 [quoting the American Psychiatric Association Statement on the Insanity Defense, 140 Am. J. Psychiatry 681, 685 (1983)] in discussing "psychotic" individuals].)  This overlap is why the court has not ordinarily "distinguished for constitutional purposes among volitional, emotional, and cognitive impairments" in considering civil commitment.  (*Ibid.* [although the court acknowledged it had not had occasion to "consider whether confinement based solely on 'emotional' abnormality would be constitutional"].)  Instead, the court's precedents provide "that within wide boundaries, state legislators may define this difficult-to-articulate concept as they wish."  (*Williams, supra,* 31 Cal.4th at pp. 773–774 [noting that the Kansas SVPA statute at issue in *Hendricks* and *Crane* was upheld *as written* and the court did not suggest it could be "constitutionally applied only with supplemental instructions, in language *not* chosen by Kansas's legislators, pinpointing the impairment-of-control issue"].)  Within this framework, we conclude that no additional instruction was required.[4]

## III

*Substantial Evidence Supports the Verdict*

Chavez argues that, even if we embrace the holding of *Putnam,* the judgment still must be reversed for lack of substantial evidence.

When reviewing a challenge to a civil commitment based on insufficient evidence, we consider the entire record in the light most favorable to the judgment to determine whether a reasonable trier of fact could have found

---

[4]     Chavez also urged us to reverse the judgment based on the fact that the petition to extend Chavez's commitment did not contain the control impairment language.  Because we conclude the jury instruction satisfied due process and the jury necessarily found Chavez had a control impairment, any error in failing to include the "serious difficulty controlling behavior" language in the petition was harmless error.  (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Hurtado* (2002) 28 Cal.4th 1179, 1194.)

19

beyond a reasonable doubt that the defendant met the requirements for the commitment. (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1503.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) If the circumstances reasonably justify the jury's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*Ibid*.) It is the exclusive province of the jury to determine credibility and to resolve evidentiary conflicts and inconsistencies. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

The People presented evidence that multiple psychiatrists and psychologists have diagnosed Chavez with either schizophrenia or schizoaffective disorder. Medical personnel who interacted with him at Patton and the jail testified that these disorders manifested themselves in symptoms including severely disorganized speech, command hallucinations, delusional ideations, and volatile emotions. They also noted that Chavez does not consistently take his prescribed psychotropic medication to control his symptoms. On two occasions within a year of the trial, Chavez engaged in behavior a jury could reasonably find indicated he had serious difficulty controlling the behavior that rendered him a substantial danger of physical harm to others.

The first incident occurred in the Patton intake unit when he became fixated on a nurse. The jury heard that Chavez could not be released from handcuffs until he answered Dr. Peterson's questions and demonstrated that he was calm. But Chavez was unable to break his focus from the nurse to answer Dr. Peterson's questions or stop yelling negative things and behaving in a threatening manner. The yelling became so extreme the nurse had to leave. Although Dr. Peterson testified that most people are able to "self-

20

regulate their behavior" and be released from their handcuffs without receiving emergency medication, Chavez was so agitated and threatening that he required two doses to calm him down.

The second incident occurred three days later, when he became agitated and was angrily yelling at a Patton staff member. Chavez somewhat discounts this event because no evidence was presented regarding the circumstances which precipitated his agitation and verbal challenge, and he did not actually assault anyone. But regardless of the precipitating events, the evidence showed that Chavez did not respond to staff questioning or efforts to calm him. Instead, he escalated the risk of physical harm by raising his fists and inviting staff to fight him. Further, the fact that Chavez did not actually assault anyone is immaterial because the jury was instructed that they could find Chavez represented a substantial danger of physical harm without proof of a recent overt act. On these facts, the jury could reasonably infer that his severe mental illness prevented him from realizing that, for safety reasons, hospital staff could not ignore a patient threatening a fight in the vicinity of other patients and staff. Moreover, after just learning three days earlier that he would not be released from physical restraints until he was calm, Chavez was unable to connect the dots and control his behavior after being placed in a five-point restraint. Instead, he continued to yell and then spit at staff. From this evidence, a jury could conclude Chavez had serious difficulty controlling his dangerous behavior.

In light of these two incidents alone, a reasonable trier of fact could have found beyond a reasonable doubt that Chavez met the requirements for continued commitment. The evidence showed Chavez had schizophrenia, a severe mental disorder. It was not in remission, as illustrated by the fact that Chavez was not consistent with his medication and continued to experience

21

disorganized thoughts and speech, hallucinations, delusions, and emotional volatility.  Finally, a jury could find the symptoms he exhibited represented a substantial danger of physical harm to those around him and that he had serious difficulty controlling his behavior.  Dr. Peterson testified that studies link things like agitation, yelling, increased emotions, and running around flailing their arms to immediate violence in the next five to ten minutes.  Because Chavez exhibited these behaviors in both incidents and was unable to regulate his subsequent anger and threatening behavior, a jury could reasonably infer Chavez continued to represent a substantial danger to others.

Although, as Chavez points out, evidence from later in the year indicates that his behavior improved, if the evidence reasonably justifies the jury's findings, we are not required to reverse merely because the circumstances might also reasonably justify a contrary finding.  (*Nelson, supra,* 51 Cal.4th at p. 210.)  Furthermore, nearly all the witnesses testified that Chavez sometimes refused to take his medication and lacked insight into the fact that he had a mental illness and would need to take medication for the rest of his life to control his symptoms.  Chavez even expressly told Dr. Dey that he did not plan to continue taking medication when he no longer had to do so.  Dr. Bloch and Dr. Cruz explained that when Chavez does not take medication, he suffers psychotic behavior, mania, disorganized thinking, and pressured speech.  As Dr. Bloch explained, a psychotic state is "characterized by inability for one to control oneself both mentally and physically."  And while the jury heard testimony that some schizophrenic individuals are able to regulate their dangerous behavior with coping skills instead of medication, Chavez attended only 23 percent of the treatment groups that might have taught him such skills.  Even Ms. Alonzo, who

22

generally testified favorably for Chavez, acknowledged that he has "limited" coping skills in terms of knowing what to do when he is experiencing a manic episode and that they have not discussed how he would cope with a hallucination.  If the jury credited this testimony, it could reasonably have concluded that Chavez continued to meet the MDO criteria throughout the year.

## DISPOSITION

The commitment order is affirmed.


McCONNELL, P. J.

WE CONCUR:


HUFFMAN, J.


IRION, J.

23